UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

JON R. CRAWLEY,                      )
                                     )
    Petitioner,                      )    CASE NO. 2:07-cv-01288-RSL-JLW
                                     )
    v.                               )
                                     )
M. KRAMER, Warden,                   )    REPORT AND RECOMMENDATION
                                     )
    Respondent.                      )
_____)

I.     SUMMARY

Petitioner Jon Crawley is currently incarcerated at the Folsom State Prison in Represa, California. He pled guilty to one count of first degree murder in Riverside County Superior Court on April 14, 1984, and was sentenced to a term of twenty-five-years-to-life, with a possibility of parole, and a consecutive term of five years for two counts of robbery. Having exhausted his remedies in the courts of California, petitioner seeks federal habeas corpus relief under 28 U.S.C. § 2254. Specifically, he challenges his 2006 denial of parole by the Board of Parole Hearings of the State of California (the "Board").[1] (*See* Docket 1.)

---

[1] The Board of Parole Hearings replaced the Board of Prison Terms, which was abolished on July 1, 2005. *See* California Penal Code § 5075(a).

REPORT AND RECOMMENDATION -1

Petitioner had been in custody for twenty-five years at the time of his 2006 hearing and approximately twenty-nine years as of this writing.

The Court, having thoroughly reviewed the record and the briefing of the parties, finds that petitioner is not entitled to the relief requested, and recommends the Court deny the petition and dismiss this action with prejudice.

## II.  BACKGROUND

The 2005 Board's report, upon which the 2006 Board relied, summarizes the facts of the crime as follows:

> On December 28, 1980, at approximately 5:00 p.m. the Riverside County Sheriff's Deputies responded to an avocado grove near Temecula, California to investigate a reported robbery/homicide. Upon arrival they were informed that Jose, Abell and Guadalupe Salgado were working at the edge of the avocado grove when a Pinto passed by them and the occupants waved. Shortly after the car passed again from the other direction and then stopped 50 to 60 feet away. The occupants got out carrying rifles and motioned for them to lie on the ground. Abell and Jose lay down but Guadalupe turned and ran up a hill. He ran about ten yards and both suspects pointed their rifles at him and shot toward him. He fell to the ground, made two noises, and lay still. As the shots were fired Jose got up and started to run but Abell told him to stop as he would be shot also. After the shots were filed the suspect later identified as Crawley went to where Guadalupe lay, took out his wallet, removed the money, and then threw it to the ground. The other suspect, later identified as Linn, took what money Abell and Jose had in their wallets and their watches. The suspects then motioned for them to leave the area. Jose and Abell then ran into the avocado grove and hid until they saw the ranch foreman. They then found Guadalupe but could not detect a pulse. The ranch foreman had given a description of the two men in the Pinto she had observed in the area earlier. Subsequent investigation centered on suspects Crawley and Linn. During the interview of family members and friends investigators found that Crawley and Linn had bragged earlier

> that they had previously robbed illegal aliens and stole avocados from the area for resale. They indicated they were not told in so many words but figured out from Crawley and Linn's nervous actions and statements that they had been involved in the murder/robbery. And noted in the probation officer's report is the inclusion of information from Crawley's jail file specifically cited as the District Attorney's file which contains transcribed interviews of many inmates. Jim Crawley confessed [to] the crime and expressed a lack of remorse.

(Dkt. 1, Ex. B at 10-11.)

During the 2006 hearing, petitioner agreed with the above facts, with two exceptions -- he maintains that he did not rob the dying victim or brag to anyone about the crime. (*See id.* at 11-18 and 57-58.) In support of his first contention, petitioner's attorney during his sentencing proceeding and his attorney during his Board hearing argued that petitioner did not rob the dying victim as evidenced by the fact that his victim was found with nearly two hundred dollars in his wallet after he was shot. (*See id.* at Ex. B at 57 & 63-64; and Ex. J at 14.)

Petitioner pled guilty to one count of first degree murder and two counts of robbery in Riverside County Superior Court on April 4, 1984. (*See id.*, Ex. A.) He received an indeterminate sentence of twenty-five years to life to run consecutive to a five-year determinate sentence for the robbery and firearm enhancements. (*See id.* & Ex. J at 21-22.) He began serving his life sentence with the possibility of parole in the California Department of Corrections on May 17, 1984. (*See id.*, Ex. B at 1.) Petitioner's minimum eligible parole date was set for October 31, 2000. (*See id.*) Including his time in custody prior to trial, he has been incarcerated for more than twenty-nine years for this offense and ten years past his minimum eligible parole date.

REPORT AND RECOMMENDATION -3

The parole denial, which is the subject of this petition, followed a parole hearing held on January 19, 2006. This was petitioner's third parole application, including his initial parole consideration hearing. His previous applications were also denied.[2] After denial of his 2006 application, petitioner filed habeas corpus petitions in the Riverside County Superior Court, and the California Court of Appeal and Supreme Court. Those petitions were unsuccessful. This federal habeas petition followed. Petitioner contends his 2006 denial by the Board violated his Fifth and Fourteenth Amendment Due Process rights. Thus, the habeas petition before this Court does not attack the propriety of his conviction or sentence, but solely challenges the Board's 2006 decision finding him unsuitable for parole.

### III. STANDARD OF REVIEW AND REQUIRED SHOWINGS

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this petition because it was filed after the enactment of AEDPA. *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Because petitioner is in custody of the California Department of Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive vehicle for his habeas petition. *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir.), *cert. denied*, 543 U.S. 991 (2004) (providing that § 2254 is "the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the

---

[2] Petitioner has had three subsequent parole hearings since his 2006 parole denial. In 2008, after this petition was filed, petitioner had a fourth parole consideration hearing in which the Board denied him a parole release date. His habeas corpus petition challenging that decision is currently pending before the United States District Court for the Eastern District of California in Case No. 2:09-cv-00955-LKK-JFM. Petitioner now moves this Court to take judicial notice of the fact that in February 2009 the Board found him suitable for parole; Governor Schwarzenegger subsequently reversed the Board's decision in July 2009. (*See* Dkt. 22.) In January 2010 the Board found him unsuitable for parole and gave him a three year denial. (*See id.*) Because we are unable to express a view as to the constitutionality of these subsequent decisions, we decline to take judicial notice of the specifics of these decisions by the Board and Governor's decision. *See Irons v. Carey*, 505 F.3d 846, 850 n.1 (9th Cir. 2007). Nonetheless, petitioner is free to pursue his due process rights based upon those subsequent decisions, *see infra* at 19.

petitioner is not challenging his underlying state court conviction."). Under AEDPA, a habeas petition may not be granted with respect to any claim adjudicated on the merits in state court unless petitioner demonstrates that the highest state court decision rejecting his petition was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2).

As a threshold matter, this Court must ascertain whether relevant federal law was "clearly established" at the time of the state court's decision. To make this determination, the Court may only consider the holdings, as opposed to dicta, of the United States Supreme Court. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000). In this context, Ninth Circuit precedent remains persuasive but not binding authority. *See id.* at 412-13; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

The Court must then determine whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *See Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. At all

times, a federal habeas court must keep in mind that it "may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be [objectively] unreasonable." *Id.* at 411. It is the petitioner's burden of establishing that the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

AEDPA also requires federal courts to give considerable deference to state court decisions, and state courts' factual findings are presumed correct. *See* 28 U.S.C. § 2254(e)(1). Federal courts are bound by a state's interpretation of its own laws. *See Murtishaw v. Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme,* 998 F.2d 710, 713 (9th Cir. 1993)). This deference, however, is accorded only to "reasoned decisions" by the state courts. To determine whether the petitioner has met this burden, a federal habeas court looks to the last reasoned state court decision because subsequent unexplained orders upholding that judgment are presumed to rest upon the same ground. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007). Where, as in this case, the state courts issue summary denials without explaining their reasons, this Court must conduct an independent review of the record to determine whether the state courts' decisions were contrary or involved an unreasonable application of Supreme Court holdings. *See Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).

//
//

## IV. FEDERAL HABEAS CHALLENGES TO STATE PAROLE DENIALS

### A. *Due Process Right to be Released on Parole*

Under the Fifth and Fourteenth Amendments to the United States Constitution, the government is prohibited from depriving an inmate of life, liberty or property without the due process of law. U.S. Const. amends. V, XIV. A prisoner's due process claim must be analyzed in two steps: the first asks whether the state has interfered with a constitutionally protected liberty or property interest of the prisoner, and the second asks whether the procedures accompanying that interference were constitutionally sufficient. *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006).

Accordingly, our first inquiry is whether petitioner has a constitutionally protected liberty interest in parole. The Supreme Court articulated the governing rule in this area in *Greenholtz v. Inmates of Neb. Penal,* 442 U.S. 1 (1979), and *Board of Pardons v. Allen,* 482 U.S. 369 (1987). *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (applying "the 'clearly established' framework of *Greenholtz* and *Allen*" to California's parole scheme). The Court in *Greenholtz* determined that although there is no constitutional right to be conditionally released on parole, if a state's statutory scheme employs mandatory language that creates a presumption that parole release will be granted if certain designated findings are made, the statute gives rise to a constitutional liberty interest. *See Greenholtz*, 442 U.S. at 7, 12; *Allen*, 482 U.S. at 377-78.

As discussed *infra*, California statutes and regulations afford a prisoner serving an indeterminate life sentence an expectation of parole unless, in the judgment of the parole

authority, he "will pose an unreasonable risk of danger to society if released from prison." Title 15 Cal. Code Regs., § 2402(a). The Ninth Circuit has therefore held that "California's parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillion*, 306 F.3d at 902. Similarly, *Irons v. Carey* held that California Penal Code § 3041 vests all "prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." 505 F.3d 846, 850 (9th Cir. 2007). This "liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d 910, 915 (2003). *See also Sass*, 461 F.3d at 1127.

Because the Board's denial of parole interfered with petitioner's constitutionally-protected liberty interest, this Court must proceed to the second step in the procedural due process analysis and determine whether the procedures accompanying that interference were constitutionally sufficient. "[T]he Supreme Court [has] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record.'" *Irons*, 505 F.3d at 851 (citing *Superintendent v. Hill*, 472 U.S. 445, 457 (1985) (holding the "some evidence" standard applies in prison disciplinary proceedings)). The "some evidence" standard requires this Court to determine "whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Hill*, 472 U.S. at 455-56. Although *Hill* involved the accumulation of good time credits rather than release on parole, later cases have held that the same constitutional principles apply in the parole context because both situations

directly affect the duration of the prison term. *See Jancsek v. Or. Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987) (adopting the "some evidence" standard set forth by the Supreme Court in *Hill* in the parole context). *Accord*, *Sass*, 461 F.3d at 1128-29; *Biggs*, 334 F.3d at 915; *McQuillion*, 306 F.3d at 904.

"The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact," however. *Hill*, 472 U.S. at 456. Similarly, the "some evidence" standard is not an invitation to examine the entire record, independently assess witnesses' credibility, or re-weigh the evidence. *Id.* at 455. Instead, it is there to ensure that an inmate's loss of parole was not arbitrarily imposed. *See id.* at 454. The Court in *Hill* added an exclamation point to the limited scope of federal habeas review when it upheld the finding of the prison administrators despite the Court's characterization of the supporting evidence as "meager." *See id.* at 457.

      B.    *California's Statutory and Regulatory Scheme*

In order to determine whether "some evidence" supported the Board's decision with respect to petitioner, this Court must consider the California statutes and regulations that govern the Board's decision-making. *See Biggs*, 334 F.3d at 915. Under California law, the Board is authorized to set release dates and grant parole for inmates with indeterminate sentences. *See* Cal. Penal Code § 3040 and 5075, *et seq.* Section 3041(a) requires the Board to meet with each inmate one year before the expiration of his minimum sentence and normally set a release date in a manner that will provide uniform terms for offenses of similar gravity and magnitude with respect to their threat to the public, as well as comply with applicable sentencing rules. Subsection (b) of this section requires that the Board set a release

date "unless it determines that the gravity of current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration." *Id.*, § 3041(b). Pursuant to the mandate of § 3041(a), the Board must "establish criteria for the setting of parole release dates" which take into account the number of victims of the offense as well as other factors in mitigation or aggravation of the crime. The Board has therefore promulgated regulations setting forth the guidelines it must follow when determining parole suitability. *See* 15 CCR § 2402, *et seq*.

Accordingly, the Board is guided by the following regulations in making a determination whether a prisoner is suitable for parole:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.
>
> (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

15 CCR § 2402(a) and (b).

REPORT AND RECOMMENDATION -10

Subsections (c) and (d) also set forth suitability and unsuitability factors to further assist the Board in analyzing whether an inmate should be granted parole, although "the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." 15 CCR § 2402(c).

In examining its own statutory and regulatory framework, the California Supreme Court in *In re Lawrence* held that the proper inquiry for a reviewing court is "whether some evidence supports the *decision* of the Board . . . that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." *In re Lawrence*, 44 Cal.4th 1181, 1212 (2008).

With regard to the circumstances of the commitment offense, the court in *Lawrence* concluded that:

> although the Board . . . may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

*Id.* at 1214. The California State Supreme Court also clarified that a Board's "focus upon the egregiousness of the commitment offense to the exclusion of the other relevant evidence has proved in practice to obscure the core statutory emphasis upon current dangerousness. . . ." *In re Shaputis*, 44 Cal.4th 1241, 1254 (2008) (citing *Lawrence*, 44 Cal.4th at 1213-14.))

REPORT AND RECOMMENDATION -11

In sum, the state's highest court has determined that the Board's decision must demonstrate "an individualized consideration of the specified criteria, but "[i]t is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; *the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public*." *Lawrence*, 44 Cal.4th at 1204-05, 1212 (emphasis added). As long as the evidence underlying the Board's decision has "some indicia of reliability," parole has not been arbitrarily denied. *See Jancsek*, 833 F.2d at 1390. Thus, while the Board's discretion in parole release matters is very broad, its decisions must focus on public safety and an assessment of a prisoner's current dangerousness. *See Lawrence*, 44 Cal.4th at 1204-06.

C. *Summary of Governing Principles*

By virtue of California law, petitioner has a constitutional liberty interest in release on parole. The parole authorities may decline to set a parole date only upon a finding that petitioner's release would present an unreasonable present risk of danger to society if he is released from prison. Where the parole authorities deny release, based upon an adverse finding on that issue, the role of a federal habeas court is narrowly limited. It must deny relief if there is "some evidence" in the record to support the parole authority's finding of present dangerousness. That is the determinative issue in this case.

V. PARTIES' CONTENTIONS

In an exceptionally well-written petition, petitioner contends that the Board violated his federal due process rights by finding him unsuitable for parole based solely upon the immutable facts of the commitment offense and his prior criminal history. (*See* Dkt. 1 at 2,

13 & 20-40.) Specifically, he asserts that there is no nexus between the evidence and whether his release would unreasonably endanger public safety, and that the Board failed to individually consider all the relevant suitability factors. (*See id*. at 20-40.)

Respondent claims that petitioner does not have a constitutionally protected liberty interest in being released on parole, that the "some evidence" standard is inapplicable in this context, and that even if he does have a protected liberty interest, the Board adequately predicated its denial of parole on "some evidence." (*See* Dkt. 9 at 4-6 & 8.) Accordingly, respondent argues that petitioner's due process rights were not violated by the Board's 2006 decision, and that the Riverside County Superior Court's Order upholding the Board's 2006 parole denial was not an unreasonable application of clearly established federal law. (*See id*. at 8.) Other than the above legal argument, respondent does little to refute petitioner's claims.

VI. ANALYSIS OF RECORD IN THIS CASE

A. *Analysis*

As set forth above, the Board is charged with deciding whether a prisoner is too currently dangerous to be found suitable for parole based upon the "circumstances tending to show unsuitability" and the "circumstances tending to show suitability." *See* 15 CCR § 2402(c)-(d).

In finding that petitioner was unsuitable for parole at the 2006 hearing, the Board relied almost exclusively on the circumstances of the commitment offense, while noting almost in passing petitioner's prior criminal history and unstable social history. And, while a petitioner's commitment offense can constitute a circumstance tending to show unsuitability, a denial of parole can only be predicated on the commitment offense when the Board can

"point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate that the prisoner presents a danger to society at the time of the suitability hearing. *In re Dannenberg*, 34 Cal.4th 1061, 1071 (2005). Relevant factors, beyond the minimum elements of a crime, include, among others, that "[m]ultiple victims were attacked, injured or killed in the same or separate incidents," that "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, "and "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." 15 CCR § 2402(c)(1)(A),(D) & (E).

In this case, the Board held that the crime was "carried out in an especially cruel and callous manner;" that "multiple victims" were involved; that "the motive for the crime was trivial in relation to the offense;" and that petitioner admitted to having committed a similar robbery prior to the murder. (Dkt. 1, Ex. B at 66-67.)

The Board's conclusion is well-supported by the record. As discussed above, petitioner and his crime partner planned to rob migrant farm workers because they knew that the victims carried large amounts of cash on them and were particularly vulnerable -- they worked in remote locations, unarmed, and commonly did not report thefts to the authorities because of their immigrant status. In addition to robbing at least two of the victims, petitioner killed one of the victims by shooting him in the back as he ran away. All three victims were brothers, so two brothers watched their other brother die and were unable to come to his assistance. The motive for the crime was to steal money to buy drugs to support the petitioner's drug and alcohol addiction. (*See id*.) *See also* 15 CCR § 2402 (c)(1) (A)(B)(D) and (E). Petitioner admits that this was not the first time he had robbed migrant farm workers.

*See* Dkt. 1, Ex. B at 18-19.) Thus, the circumstances surrounding petitioner's commitment offense and the trivial motive provide "some evidence" to support the Board's finding that the murder was carried out with particular callousness as determined by the Board.

The second and third unsuitability factors relied upon by the Board in denying petitioner a parole release date relate to petitioner's pre-incarceration history, also immutable factors. (*See id.*, Ex. B at 67.) The Board first discussed petitioner's prior criminal history and found that:

> … in terms of a previous record, the inmate does not have a – well, he does have an informal juvenile probation, and that was in 1976, and that was pursuant to a referral for battery. And then as an adult, in 1977 the inmate was arrested for assault with a deadly weapon, disposition unknown. And then in 1980 arrest[ed] for battery. And the inmate received ten days for that.

(*Id.* at 67-68.) The applicable guidelines direct the Board to consider all relevant and reliable information, which includes a prisoner's involvement in any criminal misconduct which is reliably documented. *See* 15 CCR § 2402(b). Petitioner candidly reported during the hearing that he "got into a fight" with a friend and took his friend's car when he was seventeen and that several years later, when he was still under age for drinking, he "gave some lip, some smart aleck talk to the bartender" and ended up in a fight with him. (*See* Dkt. 1, Ex. B at 30-31.) Both incidents occurred more than twenty-five years before the 2006 Board hearing, when petitioner was young and intoxicated. (*See id.*) Petitioner also admitted that he had robbed illegal migrant workers once prior to committing his life-offense. (*See id.* at 18-19.) Although petitioner is to be commended for his honesty regarding these prior undocumented incidents, such information does support the Board's finding that petitioner had a prior criminal history.

REPORT AND RECOMMENDATION -15

The Board also cited petitioner's unstable social history as an unsuitability factor, which it defined as his pre-incarceration alcohol and drug abuse. (*See id.* at 68.) The relevant statute defines an "unstable social history" as a "history of unstable or tumultuous relationships with others." *See* 15 CCR § 2402(c)(3). By contrast, a "stable social history" is defined as "reasonably stable relationships with others" and is a factor tending to show parole suitability. *See id.*, § 2402(d)(2). While the records supports a finding that petitioner was raised in a physically abusive environment by alcoholic parents and that he abused alcohol and drugs at an early age, there is no evidence of a history of unstable or tumultuous relationships with others. In fact, petitioner has maintained good relationships with his family and has a strong support system as evidenced by the Board's discussion of his "viable" parole plans and his 2005 Psychological Assessment. (*See* Dkt. 1, Ex. B at 68 and Ex. H at 2.) The Board's reliance upon petitioner's "unstable social history" is therefore inapposite. Accordingly, this unsuitability factor does not meet the "some evidence" standard.

With regard to petitioner's suitability factors, the Board noted many. Specifically, petitioner was commended for:

> being disciplinary free since 1998, and also your extensive work in Braille transcribing. You have numerous laudatory chronos and also participation at Toastmasters Program, the one hour video program that you did, "A Psychological Perspective on Re-entry," the men's violence seminar, your Alcoholics Anonymous participation, and your (indiscernible) on the way to happiness, and a certificate of appreciation in the VORG program as well as anger management and breaking barriers. And you have also done exceptional good work in your vocational EDP, food services, as a clerk, rough mail lead man construction crew, porter, vocational computer, vocational upholstery, butcher shop, storeroom worker, culinary clerk, and

again the Braille transcriber. And also you've recently passed
the certification test for mathematical Braille.

(Dkt. 1, Ex. B at 69.)

The Board found that petitioner's work with Braille had placed him in the category of "exceptional inmate." (*Id.* at 70.) In addition, petitioner received a favorable psychological report (Ex. H), in which Dr. Wagner determined that petitioner "would pose a low risk of future violence." (*See id.* at 68.) In assessing petitioner's level of dangerous, Dr. Wagner also relied upon petitioner's 2000 and 2002 Psychological Evaluations, by two different psychologists, who both determined that petitioner's potential for violence in or outside a controlled setting was low and that he the "posed very little or no threat to the community if he were to be paroled." (*Id.*, Ex. H at 6.) Dr. Wagner concluded in her 2005 report that petitioner's "ability to perform in a free society is good and his risk for recidivism is low." (*Id.* at 7.) The Board also found petitioner's parole plans were "viable and realistic" and that he had multiple offers of residence and employment. (*See id.*, Ex. B at 68.)

Although the Board praised petitioner's being disciplinary free for nearly ten years, as well as his vocational, educational and self-help programming, it determined that petitioner's commitment offense, prior criminal history, and unstable social history led to a conclusion that he remained an unreasonable risk of danger to society if released on parole.[3] (*See id.*)

---

[3] The Board does not discuss petitioner's disciplinary history, appearing to have considered this a factor in petitioner's favor. (*See* Dkt. 1, Ex. B at 66-73.) In fact, petitioner has received eight 115 Rule Violation Reports and eight 128 Counseling Chronos since his incarceration in 1984. (*See id.*, Ex. H at 5.) When misconduct is believed to be a violation of law or is not minor in nature, it shall be reported on a CDC Form 115 (Rev.7/88), Rules Violation Report" and "[w]hen . . . minor misconduct recurs after verbal counseling or if documentation of minor misconduct is needed, a description of the misconduct and counseling provided shall be documented on a CDC Form 128-A, Custodial Counseling Chrono." *See* 15 CCR § 3312(a)(2) & (3). Petitioner's most recent 115 Rule Violation was for fighting in 1991, when he got angry at another inmate who ruined his eyeglasses after agreeing to fix them. (*See* Dkt. 1, Ex. H at 5-6.) His last 128 Counseling Chrono was in 1998 for possession of tattoo paraphernalia which he was using to tattoo cups. (*See id.* at 6.)

REPORT AND RECOMMENDATION -17

01 The Board's finding is supported by "some evidence," reflects an individualized consideration
02 of the specified criteria, and properly considers petitioner's rehabilitation efforts. The Board
03 clearly set forth its reasoning when it set petitioner's next hearing out two years:

> [W]e're keeping you at the two year level primarily because of the commitment crime. Your programming behavior, since '98 at least, you know, you're definitely on the right track. I think in the working with Braille has put you in another category, the category of exceptional inmate. However, we really have to ask ourselves the question could this man be paroled next year? Looking at this crime, I don't see a Board doing it. Okay? And I'm sure you're well-versed in the law, so you know that we can rely on the commitment crime, but we're also trying to give you realistic expectations and not set you up for, you know, on getting out next year or whatever. So you still need to stay here, to make sure that those gains are recent, to perhaps get some comfort level with the DA as well as the Board, so we can make sure your gains are going to be steady and you're going to keep up. And the specific reason for the two year denial, we again, the commitment crime.

13 (Dkt. 1, Ex. B at 69-70.) The Board subsequently stated that "a longer period of observation
14 and evaluation is required before the Board should find that he is suitable for parole. And we
15 recommend you remain disciplinary free and also if available continue to participate in any
16 self-help and therapy programming that might be available here." (*Id.* at 72.)
17     As stated above, it is beyond the authority of a federal habeas court to determine
18 whether evidence of suitability outweighs the circumstances of the commitment offense,
19 together with any other reliable evidence of unsuitability for parole. The Board has broad
20 discretion to determine how suitability and unsuitability factors interrelate to support its
21 conclusion of current dangerousness to the public. *See Lawrence*, 44 Cal.4th at 1212. It is

therefore within the Board's authority to determine the weight or value of the evidence presented.

This Court recognizes, however, that the 2006 Board decision relied entirely upon the commitment offense and pre-incarceration factors (all immutable factors) in denying petitioner a parole release date. As the California courts and the Ninth Circuit have clearly held, "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." *Biggs*, 334 F.3d at 916-17. Specifically, the Ninth Circuit has held that a:

> Parole board's sole . . . reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should [petitioner] continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole release date simply because of the nature of [petitioner's] offense and prior conduct would raise serious questions involving his liberty interest.

*Id.* at 916. Here, the Board determined that the "gravity" of the commitment offense in combination with petitioner's pre-incarceration conduct as of January 2006 rendered him a present danger to society if released. The law in this Circuit still holds that this is a sufficient basis for the Board to deem a petitioner unsuitable for parole.[4] *See Irons*, 505 F.3d at 853. Thus, under the minimally stringent "some evidence standard," petitioner's prison record supports the California courts' decisions upholding the Board's decision.

---

[4] This Court is aware that *Hayward v. Marshall*, a case pending for decision before a limited en banc panel in the U.S. Court of Appeals for the Ninth Circuit, presents issues sufficiently similar to those in this case that it seems likely the en banc decision will have significant implications for the resolution of petitioner's case. 512 F.3d 536 (9th Cir.), *reh'g en banc granted*, 527 F.3d 797 (9th Cir. 2008). If *Hayward* is decided while this Report and Recommendation is pending before the presiding U.S. District Judge, he will be able to take that decision into account in ruling upon this case.

REPORT AND RECOMMENDATION -19

## VII. CONCLUSION

Given the totality of the Board's findings, there is "some evidence" in the record that petitioner's release date as of the Board's 2006 decision would have posed an unreasonable risk to public safety. The California courts' orders upholding the Board's decision were therefore not contrary to, or an unreasonable application of, clearly established federal law, or based on an unreasonable determination of facts. Because the Board and the state courts' ultimate decisions were supported by "some evidence," there is no need to reach respondent's argument that another standard applies. Accordingly, I recommend the Court find that petitioner's constitutional rights were not violated, deny the petition, deny petitioner's request for judicial notice, and dismiss this action with prejudice.

This Report and Recommendation is submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen (14) days after being served with this Report and Recommendation, any party may file written objections with this Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Report and Recommendation." Any response to the objections shall be filed and served within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time might waive the right to appeal this Court's Order. *See Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). A proposed order accompanies this Report and Recommendation.

DATED this 24th day of March, 2010.

JOHN L. WEINBERG
United States Magistrate Judge